# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>KEVIN ALLEN SEEMAN,<br><br>        Defendant. | No. 18-CR-101-CJW-MAR<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

## I.    INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 15, 2020. (Docs. 56 & 57). On June 19, 2020, the government timely filed a brief in resistance. (Doc. 58). On June 24, 2020, defendant timely filed a reply. (Doc. 59). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **denies** defendant's motion.

## II.    RELEVANT BACKGROUND

On August 3, 2018, officers interviewed defendant in response to a report that he had two stolen trailers on his property in Lisbon, Iowa. (Doc. 24, at 4). Officers later determined that a truck attached to one of the trailers was also stolen. (*Id.*). That same day, officers searched defendant's property pursuant to a search warrant. (*Id.*, at 5). Officers seized from defendant's garage, among other things, two marijuana pipes, a paper roller, ten glass methamphetamine pipes, three bags of methamphetamine, a digital scale, gem baggies, a plate with methamphetamine residue, three bottles of prescription medication with the labels removed, $25 in cash, 471 grams of marijuana inside a padlocked ammunition container, two gun scopes, several spent ammunition casings, a loaded .22 caliber rifle, and unspent .22 caliber rifle ammunition. (*Id.*). On August 4, 2018, defendant told officers he planned to buy one of the trailers from a third party who

had brought it to his property, that he had purchased the other trailer legitimately, that he sold methamphetamine to support his addiction, and that an incarcerated friend had given him the rifle for safekeeping while the friend was in prison. (*Id.*, at 4, 5).

On September 26, 2018, a grand jury issued an Indictment charging defendant with possession of a firearm by a felon in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2). (Doc. 2). That same day, officers arrested defendant. (Doc. 6). On September 27, 2018, defendant pleaded not guilty and was released pending trial. (Doc. 8). While signing-up for pretrial release that same day, defendant told the United States Probation Office ("USPO") he was a daily user of methamphetamine and had used the previous day. (Doc. 24, at 3). Defendant tested positive for methamphetamine that day and again on October 1, 2018. (*Id.*). On November 8, 2018, defendant changed his plea to guilty and was released pending sentencing. (Doc. 16). On November 26, 2018, the Court accepted defendant's plea. (Doc. 19). On November 28, 2018, defendant failed to appear for substance abuse testing. (Doc. 24, at 4). Defendant subsequently tested negative for controlled substances and had no further violations while on release. (*Id.*).

On January 24, 2019, the USPO filed defendant's final presentence investigation report ("PSR"). (Doc. 24). Defendant was, at that time, 51 years old and residing in Iowa, where he was also born. (*Id.*, at 2, 12). He reported having a positive childhood. (*Id.*, at 11). Although defendant's father was a recovering alcoholic, defendant stated it did not impact him. (*Id.*). He had his GED and had been employed at an auto repair shop for the last eight years. (*Id.*, at 2, 13). Defendant and his first wife married in 1986, had three daughters, and divorced in 1991. (*Id.*, at 11). Defendant married again in 1997 and had two more children. (*Id.*, at 12). Defendant's second wife intended to seek a divorce at the time of sentencing and his son was incarcerated for a related drug offense. (*Id.*). His son also had a history of substance abuse and drug-related criminal conduct. (*Id.*).

2

At the time of sentencing, defendant took some medications for high blood pressure and high cholesterol on and off since 2013. (*Id.*). He had no history of mental health concerns. (*Id.*). Defendant used marijuana daily from ages 18 to 40 before switching to methamphetamine daily from ages 40 to 50. (*Id.*). Defendant at times denied he had a history of alcohol abuse and other times admitted he did. (*Id.*, at 12–13). In 2016, he completed an outpatient drug treatment program. (*Id.*, at 13). In November 2018, he was diagnosed with alcohol use disorder and severe methamphetamine use disorder. (*Id.*). Defendant was referred to and completed a drug treatment program. (*Id.*). His criminal history was negligible aside from his 2016 convictions for a methamphetamine tax stamp violation, possession of precursors, and gathering where marijuana was used. (*Id.*, at 9). Defendant received a deferred judgment and was still on probation for these offenses at the time of the offense conduct here. (*Id.*). His 2016 offenses and his instant offense were substantially similar, aside from the absence of a firearm in the former.[1]

On February 14, 2019, the Court sentenced defendant. (Doc. 30). Defendant was in criminal history category II with a total offense level of 17, yielding an advisory guideline range of imprisonment of 27 to 33 months followed by up to three years on supervised release. (Doc. 24, at 16). Defendant moved for a downward variance based on the nature of the offense and his characteristics. (Doc. 27). The Court denied his motion and sentenced him to 27 months' imprisonment followed by three years on supervised release. (Doc. 31). Defendant is currently incarcerated at FMC Lexington with a projected release date of February 21, 2021. (Doc. 57, at 2).

---

[1] In 2016, officers searched defendant's same garage and found 60 grams of methamphetamine, packaging materials, scales, large sums of cash, pseudoephedrine pills, marijuana, and drug paraphernalia. (Doc. 24, at 9).

3

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guideline ("USSG") discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover;

4

(3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On April 15, 2020, defendant submitted his request for release to FMC Lexington's warden. (Doc. 57–1). The warden never responded. On June 15, 2020, defendant filed his motion for release now before the Court. (Doc. 56). Because 30 days have now elapsed since defendant submitted his request to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

5

## B. Extraordinary and Compelling Reason

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19 a second time. (Doc. 57, at 6–14). Defendant cites, among other things, his diagnoses of chronic obstructive pulmonary disease ("COPD"),[2] interstitial lung disease ("ILD"),[3] diabetes, hypertension, hyperlipidemia, and his prior infection with COVID-19. (*Id.*, at 9–10). The government argues, in short, that there is no evidence defendant suffered during his bout with COVID-19, that his health conditions are insufficient, and that there is no indication he would receive better medical treatment if released. (Doc. 58, at 10–14).

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases); *see also People Who are at Increased Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html.

Defendant offers the report of Dr. Mary Montgomery, a treating physician at Brigham and Women's Hospital specializing in infectious diseases and an Instructor of Medicine at Harvard Medical School. (Doc. 57–2). Although Dr. Montgomery did not treat defendant, she reviewed his medical records for the last two years and concluded defendant is at risk of delayed complications from his first COVID-19 infection and

---

[2] COPD "refers to a group of disease that cause airflow blockage and breathing-related problems." *What is COPD?*, CDC, https://www.cdc.gov/copd/index.html.

[3] ILD, apparently also referred to as interstitial pulmonary disease, "is an umbrella term used for a large group of diseases that cause scarring (fibrosis) of the lungs. The scarring causes stiffness in the lungs which makes it difficult to breathe and get oxygen to the bloodstream. Lung damage from ILDs is often irreversible and gets worse over time." *Interstitial Lung Disease (ILD)*, American Lung Association, https://www.lung.org/lung-health-diseases/lung-disease-lookup/interstitial-lung-disease; *see also* (Doc. 57–2, at 2).

6

further severe consequences if infected again. (*Id.*, at 1–2); *see also* (Doc. 57, at 9) (noting Dr. Montgomery reviewed roughly two years of defendant's records). As to defendant's COPD, Dr. Montgomery noted his wheezing, shortness of breath when walking, and prior need for a portable oxygen device. (Doc. 57–2, at 2). As to his ILD, Dr. Montgomery also noted defendant's susceptibility to respiratory distress. (*Id.*). She emphasized defendant's difficulty breathing while in isolation with COVID-19 and his even greater difficult just one year earlier during a bout of pneumonia. (*Id.*, at 3). Dr. Montgomery highlighted defendant's lifetime of heavy smoking, family history of colon cancer, and diagnoses of hypertension, diabetes, and hyperlipidemia in finding defendant is seriously at risk when exposed to respiratory illnesses. (*Id.*, at 2–3). Dr. Montgomery asserted the long-term effects of COVID-19 are still unknown and that former patients like defendant should continue to take precautions. (*Id.*, at 3).

Dr. Montgomery's opinion fails to discuss defendant's inconsistent respiratory history. Defendant uses an inhaler only as needed. (Doc. 57–3, at 30, 130). He was diagnosed with COPD in early 2019. *See, e.g.*, (*Id.*, at 64). In summer 2019, he had a significant bout of pneumonia which appears to be the only time in the record he experienced some wheezing and respiratory distress. (*Id.*, at 37). In September 2019, his COPD diagnosis was disputed. *See, e.g.*, (*Id.*, at 46–47). On February 24, 2020, Dr. James R. McCormick examined defendant via telemedicine, found no evidence of obstructed breathing, and concluded defendant did not have COPD. *See, e.g.*, (*Id.*, at 145–46). His respiratory rate on that date was normal at 16.[4] (*Id.*, at 24). On April 22, 2020, defendant's records reaffirmed his COPD diagnosis and noted abnormal imaging.

---

[4] "Normal respiration rates for an adult person at rest range from 12 to 16 breaths per minute." *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure#:~:text=Respiration%20rates%20may-%20increase%20with,to%2016%20breaths%20per%20minute.

(*Id.*, at 20). His ILD is consistently described as mild, (*id.*, at 18, 27), but Dr. McCormick expressed doubt about this diagnosis as well. (*Id.*, at 130). On April 29, 2020, defendant's lung scarring was noted as "benign." (*Id.*, at 18). His respiratory rates were somewhat high in early May 2020 while infected with COVID-19, ranging from 18 to 20.[5] (*Id.*, at 7, 13, 16). Despite his diagnosis, defendant had no complaints. (*Id.*, at 7). Defendant reported no shortness of breath on multiple occasions and as recently as May 9, 2020. (*Id.*, at 6, 11, 12, 15, 20, 130). Defendant's medical records place little emphasis on his other health conditions as well. Little is discussed about his diabetes beyond its existence. *See, e.g.*, (*Id.*, at 23, 26, 28, 56). His hypertension, diagnosed sometime in 2017, is described only as "significant" but "under good control now" due to medication.[6] (*Id.*, at 56, 130, 146, 170). His hyperlipidemia is also noted as "significant" and medicated.[7] (*Id.*, at 32, 56).

Defendant's health conditions present a difficult case. On one hand, his conditions fall into three of the CDC's risk categories, namely persons with chronic lung conditions, serious heart conditions, and diabetes. *See People of Any Age with Underlying Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions-/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc-.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-

---

[5] Defendant is recorded as having a normal to high respiratory rate in the 16 to 20 range on previous occasions as well. (Doc. 57–3, at 51, 77, 163, 174, 184, 223. 241, 290). There are no instances in the record when his respiratory rate was deficient.

[6] Defendant's two most recent blood pressure checks, his only two in 2020 in February and May respectively, both showed he was within normal range, not hypertensive or even elevated. His blood pressure throughout 2019 was sometimes elevated or in stage one of hypertension. (Doc. 57–3, at 78); *see also Understanding Blood Pressure Readings*, American Heart Association, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.

[7] His most recent cholesterol on record from April 16, 2020, is 227, just above the normal 125 to 200 range. (Doc. 57–3, at 109); *see also Cholesterol Levels: What You Need to Know*, MedlinePlus, https://medlineplus.gov/cholesterollevelswhatyouneedtoknow.html.

8

risk.html. On the other hand, he experiences little to no complications related to these conditions on a day-to-day basis. Thus, although defendant appears to have multiple vulnerabilities, none of them are particularly serious alone. *See United States v. Brown*, No. 1:04-cr-00006, 2020 WL 3035916, at *1–2 (M.D. Tenn. June 4, 2020) (denying release in part because the defendant's diabetes, hypertension, hyperlipidemia, and lymphoma were well treated and the record did not reflect his asserted liver disease). The record shows defendant has some respiratory issues, particularly during his 2019 pneumonia illness, as well as some high blood pressure, high cholesterol, and diabetes, but offers little reason for concern overall. Moreover, he is only 52 years old. (Doc. 24, at 2).

In considering defendant's conditions, the Court must also evaluate to what extent he is at risk of exposure to COVID-19 at FMC Lexington. Currently, there are seven positive cases of COVID-19 at FMC Lexington, all among inmates. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. Seven inmates have died. *Id*. A total of 229 inmates have recovered from COVID-19 along with ten staff persons. *Id*. Although it appears cases at FMC Lexington are trending downward, the facility has experienced a significant outbreak which has the potential to flare-up again despite the BOP's prudent measures to stymie the virus. In *United States v. Lee*, the Eastern District of Virginia granted release to a defendant with diabetes, hypertension, hyperlipidemia, and a prior asymptomatic case of COVID-19 in part because there was a COVID-19 outbreak at the defendant's BOP facility and the defendant had received "inadequate" medical care. No. 1:95-cr-58 (LMB), 2020 WL 3422772, at *2–4 (E.D. Va. June 22, 2020).

Here, defendant has received adequate medical care and FMC Lexington's COVID-19 cases are waning. Despite defendant's medical conditions and FMC Lexington having a significant COVID-19 outbreak, the record lacks any indication that defendant's health is failing in any way. Even when he had COVID-19, defendant experienced little more than a dry cough and some fatigue. (Doc. 57–3, at 13). FMC Lexington's COVID-19 cases could rise again, and defendant could be infected again.

9

That said, the Court has little reason to believe his illness would be significantly greater than it was the first time.

Thus, the Court finds defendant has not presented an extraordinary and compelling reason for release and **denies** his motion on this basis. In the alternative, the Court will independently discuss the Section 3553(a) factors as if defendant had presented an extraordinary and compelling reason for release.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The 3553(a) factors are mixed but slightly weigh against release. Defendant has held stable employment and has little criminal history. He is a long-time user of controlled substances and has been diagnosed as an addict and completed drug treatment in the past. The offense itself here is not particularly aggravating. It appears defendant did not know that one of the trailers and its attached truck were stolen. His garage contained only a small quantity of drugs and distribution supplies, which is consistent with defendant's statement that he only sells drugs to support his habit. There is no indication the firearm in defendant's garage was necessarily connected to his use or distribution of controlled substances, although it was loaded and the spent shell casings

10

indicate it had been fired. Defendant was otherwise cooperative with officers. Far and away the most aggravating circumstance here is that defendant was on probation for nearly identical state offenses at the time he committed the instant offense. It is worth noting he did not receive a term of imprisonment for his prior offenses and thus this is the first term of incarceration he has ever served. Defendant also tested positive for methamphetamine twice while on pretrial release. Defendant has served 15 months of his 27-month term of imprisonment. (Doc. 57, at 16). While incarcerated, defendant has had no disciplinary reports and has taken a significant number of classes. (Doc. 57–4). His release plans also appear promising. (Doc. 57–5). Although many mitigating factors are present, defendant's repetition of his criminal conduct while on probation suggests he requires significant deterrence.

On balance, the aggravating factors present here slightly weigh in favor of maintaining defendant's sentence in order to fulfill the goals of Section 3553(a).

## V.    CONCLUSION

For these reasons, defendant's Motion for Compassionate Release is **denied**. (Doc. 56). Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 31).

**IT IS SO ORDERED** this 21st day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa